PHILLIP A. TALBERT
United States Attorney
BRIAN K. DELANEY
Assistant United States Attorney
THOMAS WHEELER
Acting Assistant Attorney General
SAMANTHA TREPEL
Trial Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 1:15 CR 00265 DAD |
|---|---|
| Plaintiff, | |
| v. | |
| JUSTIN WHITTINGTON, | |
| Defendant. | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States, through its undersigned attorneys, submits the following memorandum in aid of sentencing. The sentencing hearing is currently scheduled for Monday, March 13, 2017, at 10:00 a.m.

**I.    Factual Background and Procedural History**

On September 24, 2015, a federal grand jury returned a four-count Indictment against defendant Justin Whittington, charging him with one count of interfering, by force or threat of force, with a person's housing rights because of his race, color, or national origin, in violation of 42 U.S.C. § 3631; one count of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); one count of unlawful

possession of a prohibited firearm, in violation of 26 U.S.C. § 5861(d); and one count of making a false statement to a special agent of the FBI in violation of 18 U.S.C. § 1001.

On November 29, 2016, the defendant pleaded guilty to unlawful possession of a prohibited firearm, Count Three of the Indictment. On December 5, 2016, following a five-day trial, the jury found the defendant guilty of the three remaining counts. At trial, the evidence demonstrated that in the late afternoon on December 19, 2012, the defendant and his step-brother, Jesse Lamb, were drinking alcohol outside the apartment complex where the defendant lived on McCray Street in Oildale, CA. At some point early that evening, the defendant and Lamb got into a dark colored PT Cruiser belonging to a friend, and drove off. Lamb and the defendant were driving down Wilson Avenue while the victim, J.N., a Latino man, was in his front yard. J.N. had just returned from watching a young relative's t-ball game with his wife and fifteen-year-old son. The PT Cruiser drove slowly past J.N.'s home and came to a stop in front of his neighbor's house. J.N. thought this was unusual and paid close attention the car. The defendant, whom J.N. had never seen before, got out of the front passenger seat of the car holding a sawed-off shotgun. The defendant shouted "fucking nigger," fired one round toward J.N. from about fifteen yards away, and yelled "get the fuck out of Oildale." J.N. heard pellets fly by his head, and believed for a moment that he had been shot. The defendant got back into the car and it drove off slowly, using its turn signal. J.N.'s wife called the police. J.N. did not see the car's driver, but could tell that at least one other person was in the car. J.N. got a good look at the shooter because the dome light of the car was on, and described him as a white man with a tattoo on his head, and who wore tan pants and a dark colored hoodie. J.N. told the responding deputy that he would be able to identify the shooter again if he saw him. He described the car as a dark colored, dirty PT Cruiser with a decal in the center of the back window.

J.N.'s wife was standing in front of their house when she heard the shooter yell "fucking nigger" and fire a shot. She immediately focused on ensuring that her son was safe and that he stayed down and got into the house, so she did not get a good look at the shooter. She saw a white man wearing a hoodie and with a tattoo on the top of his forehead, getting back into the passenger seat of a dark colored PT Cruiser while holding a long metal object. The PT Cruiser drove away, and a few moments later, she heard another shot being fired from the direction the PT Cruiser had been traveling in. She called 911 and described what had happened to the police. As a result of the shooting, the victim's family was concerned

2

about their safety, and moved from their home shortly thereafter.

Moments after the defendant shot at J.N., a young man was working in a convenience store a few blocks away. He had already closed the shop for the evening, but was laying tile in the back room when he heard a loud blast. He called the police and remained hidden in the back of the shop until the police arrived. When he came out, he saw that the blast had blown a large hole in the glass door of his shop. He also found marks and indentations on the metal gate that he had locked over the glass door.

A woman who lived across the street from the shop was washing dishes. She heard her dog barking and looked out her window. She watched a dark colored PT Cruiser drive past her window and stop in the intersection in front of the shop, with the driver's side of the car facing the front of the store. The car remained there for several seconds, and then she heard a loud boom and saw a flash coming from the car, and the car sped away in the same direction it had previously been heading. After the police arrived, she went outside and saw that the blast had made a large hole in the shop's glass door.

A neighbor of the defendant's observed the defendant and Lamb return to the McCray street apartments, driving quickly. They parked the PT Cruiser, and jumped out of the car. The defendant exited from the front passenger's seat, and Lamb exited from the driver's seat. When the defendant stood up, a shell case fell out from his open car door. It rolled toward the neighbor's Dodge Charger parked in the spot next to the PT Cruiser. The defendant ran into his apartment and the neighbor heard him saying, "hide this" and "shut up, act like nothing happened." The defendant then came back outside, took beer out of the PT Cruiser, and told Lamb to open a beer and start drinking, and to act normal.

The defendant's neighbor testified that, a couple of days after the incident, when the defendant returned to his apartment after being detained by KCSO, she heard the defendant say that "all he did was fire off a couple of rounds." The defendant told the neighbor that he was going to move to Michigan rather than stick around and find out whether he was going to get into trouble for the incident. The following day, the defendant abandoned his apartment, leaving some furniture and personal belongings behind.

Minutes after the shooting, on the way to respond to emergency calls about shots fired, a Kern County Sheriff's Office deputy noticed two men standing near a dark colored PT Cruiser parked at an apartment complex, about a mile from the reported shootings. As the deputy pulled into the parking lot,

3

the defendant kicked the shell case under the Dodge Charger, and the defendant and Lamb began walking away from the deputy's car.  The deputy yelled twice at the defendant and Lamb to stop, and after the second time, they did.  The deputy noticed that Lamb had a can of Budweiser beer in his hand.  The defendant and Lamb told the deputy that they did not know whom the PT Cruiser belonged to and that they had not seen anyone drive it that evening.  The deputy placed his hand on the hood of the PT Cruiser.  It was still warm to the touch.  He also observed a can of Budweiser beer inside the PT Cruiser.  The deputy detained the men, and J.N., the victim, was shown both men during a show-up procedure not long after.  First, J.N. was shown Lamb, whom he did not recognize.  Next, he was shown the defendant, whom he immediately positively identified as the shooter.  Later, at trial, J.N. again identified the defendant as the shooter.  Kern County Sheriff's Office deputies then recovered the sawed-off shotgun in the trunk of the defendant's Crown Victoria, which was parked near the PT Cruiser, after the defendant consented to a search.  J.N. was shown the shotgun and the PT Cruiser, and he positively identified both.

Deputies also located live shotgun shells inside the PT Cruiser, under the Charger, and in the defendant's bedroom, and two spent shotgun shells, one in the bushes near where the two men were standing and the other in the defendant's bedroom.  The spent shells were submitted to the FBI Crime Laboratory for analysis and the lab determined the spent shells were fired from the shotgun seized from defendant's trunk.

KSCO deputies also collected and analyzed latent fingerprints from the PT Cruiser.  Both the defendant and Lamb's prints were found on the exterior of the car.

The defendant gave multiple statements to law enforcement officers about events that night.  In his initial statements, he denied any knowledge of the shooting, denied that he was ever in the PT Cruiser or that his fingerprints would be found on the car. Whittington admitted to law enforcement that night, however, that he had been a member of the Oildale Peckerwoods, a white supremacist gang, and has gang tattoos, including a "P" and a "W" on his shins, for the Peckerwoods, and a "23" on his stomach symbolizing the 23rd letter of the alphabet, W, for White Power.  A Kern County Sheriff's Office Sergeant and expert in white supremacist gangs testified at trial that the Oildale Peckerwoods are a white supremacist gang that believes in a racial hierarchy, with whites at the top, and typically denigrates anyone they consider non-white by using racially derogatory terms, including "nigger."

4

The defendant's neighbor also testified that, during the year prior to the shooting, the defendant walked around their apartment complex exposing white power tattoos on his chest and informed her that he intended to get additional white power tattoos on his back. She further testified that the defendant frequently used racial slurs, including "nigger," and did so in front of her children, who are biracial, despite her requests that he not do so.

The FBI conducted a voluntary, non-custodial interview with the defendant on April 18, 2014, outside on the porch of the house where he was then staying. Before beginning the interview, the FBI agents introduced themselves, explained the nature of the interview, and that lying to a federal officer is illegal. The defendant then told the FBI that on the night of the shooting, he had been hanging out with Lamb in front of his apartment building, when two men he knew, "Charlie" and "Bubba," pulled up in a PT Cruiser. "Charlie" offered the defendant $1000 to keep a sawed-off shotgun in the trunk of the defendant's car. The defendant said that he wrapped the shotgun in his work coat and placed it in the trunk of his Crown Victoria.

In his final statement, given after his arrest on the instant charges, the defendant admitted that he and his step-brother and two friends had been drinking that evening, and decided to drive around and fire a sawed-off shotgun. He claimed that his step-brother screamed the word "nigger" and fired the gun, and that each of the friends also took a turn firing the gun at different locations. He further stated that, once they returned to his apartment complex, he wrapped the shotgun in his work clothes and hid it in the trunk of his Crown Victoria.

## II.   Sentencing Recommendation

### a.   Sentencing Guideline Range

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable Sentencing Guideline range under 18 U.S.C. § 3553(a)(4). These guidelines are the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Once a court has determined the appropriate sentencing range, it should then consider that range in the light of the relevant § 3553(a) factors. *Id*. at 49-50.

The Presentence Investigative Report (PSR) correctly calculates the defendant's offense level as 32 and places him in criminal history category III. This results in a Guideline range of 151 to 188 months for Counts One, Three, and Four. The defendant also faces a ten-year statutory minimum, to be served consecutively to any other term of imprisonment. 18 U.S.C. § 924(c)(1)(A)(iii) & (c)(1)(B)(i).

### b. Sentencing Variance Inapplicable

After determining the applicable Guidelines range, a court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a). In considering those factors, particularly the history and characteristics of the defendant, the PSR recommends that the Court sentence the defendant to a substantial downward departure, from 151 to 188 months, to 24 months for Counts One, Three, and Four. The history and characteristics cited by the PSR, however, do not come close to justifying the magnitude of the recommended variance from the Guidelines range. Indeed, such a substantial variance would ignore the gravity of the defendant's actions and the impact of his crimes on the victim and the victim's family.

Section 3553 requires to the Court to consider the need for the sentence imposed to: 1) reflect the seriousness of the offense; 2) promote respect for the law; 3) provide just punishment for the offense; 4) afford adequate deterrence to criminal conduct; 5) protect the public from further crimes of the defendant; and, 6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2). Section 3553(a) also directs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been convicted of similar conduct. § 3553(a)(1) & (6). Section 3553(a) then requires the Court to impose a sentence sufficient to comply with these purposes.

The Presentence Investigation Report (PSR) recommends a downward variance from 151 to 188 months to 24 months – a 10- to almost 16-year variance, or the equivalent of a 17-level downward departure – for the defendant based on his youth, "purported physical and sexual abuse as a child, drug addiction, limited education, difficult childhood, physical and mental health issues, lack of occupational skills, limited criminal

6

record, and lack of a prior prison record." None of these factors, however, place him outside the "'mine run of roughly similar' cases considered by the Sentencing Commission in formulating the Guidelines." *United States v. Carter*, 560 F.3d 1107, 1011-12 (9th Cir. 2009) (imposition of a within-Guidelines sentence reasonable despite defendant's youth, prior non-violent criminal history, and difficult childhood because nothing about those circumstances placed the defendant outside the heartland of similar characteristics and circumstances contemplated by the Guidelines); *United States v. Stoterau*, 524 F.3d 988, 1002 (9th Cir. 2008) (imposition of within-Guidelines sentence reasonable because abuse defendant "suffered as a child, his mental health issues, and his life-long struggle with methamphetamine addiction" did not constitute special circumstances compelling a downward variance).

Additionally, several of the characteristics the PSR cites in support of a variance are disfavored as bases for a departure from the Guidelines range: two are generally not relevant, and one is specifically prohibited from consideration as a ground for departure. *See* U.S.S.G. § 5K2.0(d) (prohibiting the consideration of drug or alcohol dependence or abuse as a ground for departure); § 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant"); § 5H1.12 ("[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted"). Other characteristics cited by the PSR in favor of a variance, such as the defendant's age, limited criminal record, and lack of a prior prison record, on closer examination, and when considered together, actually undercut Probation's recommendation. The Guidelines calculation already takes account of the defendant's criminal history. And although the defendant, at 21 years old, was young at the time he committed the instant offenses, he did not have a clean record beforehand, and had spent time in a juvenile facility. Further, in the less than three-year period between when he committed the instant crimes and when he was detained, he committed a violent offense against his then-three-year old child. The defendant's lack of prison time is therefore more attributable to his youth than to any demonstrated ability to obey the law. Both his youth and lack of prison time should not therefore be factors that weigh in his favor. Similarly, the PSR lists the defendant's lack of occupational skills as additional support for the variance, yet the PSR itself

undercuts that recommendation, as it notes that the defendant is "skilled in construction, welding, and oil field pipeline repair" and that he has worked as a welder and on home repair.  PSR at 21.

A downward variance of the magnitude recommended here requires significantly more to support it than this defendant's history and characteristics as described in the PSR.  As an *en banc* panel of the Ninth Circuit noted, "'a major departure should be supported by a more significant justification than a minor one' . . . . [T]he greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a)—such as, for example, unwarranted disparity—may figure more heavily in the balance." *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50); *see also United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) (en banc) ("The Supreme Court in *Gall* explicitly instructed [appellate courts] to consider . . . the 'extent of the deviation [from the Guidelines range] and ensure that the justification is sufficiently compelling to support the degree of the variance.") (citing *Gall*, 552 U.S. at 47) (third alteration in original). While the defendant's characteristics and history may support a sentence on the lower end of the Guidelines range, or even a more minor downward variance, they are far from sufficient to justify a downward variance from between 10 and 16 to two years.  *See U.S.S.G.* § 5H Commentary (noting that "[g]enerally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside of the applicable guideline range but for . . . determining the sentence within the applicable guideline range" and listing lack of guidance as a youth, criminal history, drug abuse, mental and emotional conditions, and employment records all as factors that, unless present to an unusual degree, do not ordinarily justify downward departures.).

Ultimately, a twelve-year sentence for shooting a sawed-off shotgun at a complete stranger standing in his front yard with his family, because of his race and his choice to live in a particular neighborhood, and then lying about it to the FBI, neither reflects the seriousness of the defendant's crimes nor provides a just punishment for them.  It also fails to account for the defendant's failure to accept responsibility for his actions, even after conviction.  A significant downward variance would also not afford adequate deterrence of similar conduct by others, and would send the signal that terrorizing a family on the basis of their race is not deserving

of serious sanction. Moreover, it fails to satisfy § 3553(a)'s additional directive to avoid large and unwarranted sentencing disparities. The purposes enumerated in § 3553(a) would thus not be served by a sentence that deviates so significantly from the Guidelines range. The PSR's recommendation should therefore be rejected. The United States does not, however, object to a more moderate downward variance and recommends that instead, this Court impose a sentence of 120-months for Counts One, Three, and Four, for a total sentence of 240 months. Such a sentence would be sufficient, but not greater than necessary to comply with the purposes set out in § 3553(a).

### III.    Conclusion

For the reasons set forth above, the United States respectfully requests that the defendant be sentenced to 120 months for Counts One, Three, and Four, consecutive to a 10-year sentence for Count Two. Such a sentence will take account of the defendant's history and characteristics while reflecting the gravity of his crimes, affording adequate deterrence, and promoting respect for the law.

Dated: March 9, 2017                      Respectfully submitted,

                                          PHILLIP A. TALBERT
                                          United States Attorney


                                   By     /s/ Brian K. Delaney
                                          BRIAN K. DELANEY
                                          Assistant U.S. Attorney

                                          /s/ Samantha Trepel
                                          SAMANTHA TREPEL
                                          Trial Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 9, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

>  */s/ Brian K. Delaney*
>  BRIAN K. DELANEY
>  Trial Attorney