PHILLIP A. TALBERT
Acting United States Attorney
BRIAN K. DELANEY
Assistant United States Attorney
THOMAS WHEELER
Acting Assistant Attorney General
SAMANTHA TREPEL
Trial Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN WHITTINGTON,<br><br>Defendant. | CASE NO. 1:15 CR 00265 DAD |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, through its undersigned attorneys, submits the following memorandum in aid of sentencing. The sentencing hearing is scheduled for Monday, April 10, 2017, at 10:00 a.m.

**I.   Procedural History**

Probation filed its Presentence Investigative Report (PSR) on February 6, 2017, ECF No. 61. The PSR calculated the defendant's offense level as 32, and placed him in criminal history category III, resulting in a Guideline range of 151 to 188 months for Counts 1, 3, and 4. *See id.* at 13, 17. The PSR also noted that the defendant faces a ten-year statutory minimum, to be served consecutively to any other

term of imprisonment. 18 U.S.C. § 924(c)(1)(A)(iii) & (c)(1)(B)(i).  The PSR then recommended that the defendant be sentenced to a term of 24 months on each of Counts 1, 3, and 4, to be served concurrently, and a term of 120 months on Count 2, to be served consecutively, for a total term of imprisonment of 144 months.  Although neither party objected to the PSR's Guidelines calculation, both the United States and the defendant filed Sentencing Memoranda.  The United States recommended that the Court sentence the defendant to 120 months' imprisonment for Counts 1, 3, and 4, consecutive to a 10-year sentence for Count 2.  The defendant urged the Court to accept the PSR's recommendation.

On March 10, 2017, during the sentencing hearing, the Court raised the question of whether calculating the defendant's offense level using the Guideline for assault with intent to commit murder or attempted murder was appropriate and heard oral argument.  At the conclusion of the hearing, the Court requested that Probation provide an alternative Guidelines calculation and sentencing recommendation, and provided the parties with an opportunity to submit responses.

Probation computed an alternative Guideline calculation under § 2K2.1(a)(5), unlawful possession of a firearm, for a total offense level of 27, with a resulting range of 87-108 months.  The alternative PSR recommended the same sentence of 24 months imprisonment for Counts 1, 3, and 4, consecutive to 120 months for Count 2.  *See* Rev. PSR at 1-2, 6.

The United States stands by its original recommendation but recognizes the Court's concern that the defendant may not have intended to murder Joe Nuno.  If the Court rejects the United States' original position, the United States respectfully requests that the Court consider a Guideline sentence of 228 months, i.e. 120 months on Count 1, to be served consecutively to 108 months on Count 3.

## II.     Sentencing Recommendation

### a.    Sentencing Guideline Range

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable Sentencing Guideline range under 18 U.S.C. § 3553(a)(4).  These Guidelines are the "starting point and the initial benchmark" for federal sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Once a court

has determined the appropriate sentencing range, it should then consider that range in light of the relevant § 3553(a) factors. *Id*. at 49-50.

As noted above, the initial PSR calculated the defendant's total offense level as 32, relying on the § 2A2.1(a)(2) Guideline for assault with intent to commit murder. *See* PSR at 13-14, ECF No. 61. The PSR's reliance on § 2A2.1(a)(2) is supported by the evidence elicited at trial and the victim's unwavering statements throughout the investigation.

The victim, Joe Nuno described how the defendant shot at him multiple times throughout the investigation: to KCSO Deputies Ryan Pollack and Douglas Sword on the night of the shooting, to the FBI on October 23, 2013, before the grand jury on February 26, 2015, and at trial. Each time, Mr. Nuno stated that the defendant pointed the shotgun at him and fired it. According to Deputy Pollack's report, which was consistent with his trial testimony, Mr. Nuno reported that "[a]n unknown male subject, later identified by him as JUSTIN WHITTINGTON, exited the front passenger seat of the vehicle. NUNO said WHITTINGTON was holding onto an unknown object . . . [that] was small and dark in color. NUNO heard a noise similar to noises of a shotgun being manipulated. NUNO said he heard WHITTINGTON yell, 'You fucking Nigger!' WHITTINGTON then pointed the shotgun towards NUNO and fired it once." Pollack Rpt., attached as Exhibit 1. Similarly, Deputy Sword summarized Mr. Nuno's account, writing, "The front seat passenger pointed a short shotgun at JOE and said 'fucking nigger'. The front seat passenger then fired one shot from a shotgun. JOE said the shotgun was pointed at him when it was fired. JOE said he just stood there and was in shock. JOE believed the shooter made the statement 'fucking nigger' because he was Hispanic." Sword Rpt., attached as Exhibit 2.

The FBI interviewed Mr. Nuno on October 23, 2014. The FBI's summary of Mr. Nuno's interview indicates he told agents, "A man jumped out of the front passenger side of the car, pulled out a gun with a short barrel, turned and said 'fucking nigger' to NUNO . . . NUNO felt like something was wrong with the gun because it sounded like a bomb." Mr. Nuno noted that his "first reaction when he was shot at was

that he was stuck or frozen.  He said when it happened his thought was, 'where'd I get hit this time?'"

Nuno 302, attached as Exhibit 3.

    On February 26, 2015, Mr. Nuno testified before the grand jury as follows:

| | |
|---|---|
| Question: | And what happened? Did someone get out of the passenger side of that vehicle? |
| Answer: | Yeah, the passenger got out. And can I say it the way he said it? |
| Question: | Yes, just what he said. |
| Answer: | He said, "You fucking nigger," and he shot at me. |
| Question: | Did he say that to you? |
| Answer: | Yes, to me. |
| Question: | Right at you? |
| Answer: | Straight to me. Pointed a gun, yeah. |
| . . . | |
| Question: | Did – could you see the barrel of that gun pointed at you? |
| Answer: | Oh yeah. |
| Question: | Do you remember – and then it fired; is that correct? |
| Answer: | Yeah. |
| Question: | Were you hit with any pellets at all? |
| Answer: | I felt like I was hit.  It went right – like right over my head. |
| Question: | It just missed you? |
| Answer: | Right over my head. |
| Question: | You could feel the wind as it flew over your head? |
| Answer: | I froze. |

Nuno GJ Tr. 12:6-15; 16:24 – 17:12.

    At trial, Mr. Nuno again testified that the defendant pointed the shotgun directly at him and fired it, and said he believed he had been shot.

| | |
|---|---|
| Answer: | The gentleman stepped out of the car in the passenger side, had certain clothes on that I could identify.  He stepped out of the car and called me a F'ing nigger. |
| Question: | And what else happened after he said this? |
| Answer: | He raised a gun with both of his hands and shot toward me. |
| . . . | |
| Question: | [W]hat was your reaction after this blast? |
| Answer: | Scared. I thought I was – I thought I'd been shot, sir. |

Trial Tr. 13:25 – 14:4; 16:10-12, Nov. 30, 2016

| | |
|---|---|
| Question: | [S]o we're fair to your testimony, there was a mention about three seconds. And what took three seconds? |
| Answer: | When he pointed the gun at me. |
| Question: | Between bringing the gun up, pointing it at you and firing it took three seconds? |
| Answer: | Yes, sir. |

4

Trial Tr. 55:15-21, Nov. 30, 2016. No evidence at trial contradicted Mr. Nuno's consistent testimony that the defendant pointed his shotgun directly at Mr. Nuno and fired.

The police reports and testimony thus demonstrate that, from the date of the incident through trial, Mr. Nuno has consistently maintained that the defendant shouted a racist slur, pointed the shotgun directly at Nuno, and fired it. While no one can ever know with absolute certainty the thoughts in another person's mind, one can infer a person's thoughts from their actions and the likely consequences of their actions. Here, it is unrebutted that the defendant yelled a racial slur at Mr. Nuno. It is unrebutted that the defendant then pointed a particularly dangerous weapon at the victim and pulled the trigger. It is also unrebutted that the defendant was motivated by hate, that he had demonstrated his racial animus in the past, and that he had tattooed messages of racial hatred onto his body. Based on that evidence, it is therefore reasonable to infer that the defendant intended the consequences of his actions, that is, to inflict serious bodily harm on Mr. Nuno, or even to kill him, because of his race. The facts thus support the conclusion that assault with intent to commit murder, or attempted murder, is the correct Guideline to apply to the defendant's conduct. The Court should therefore use a total offense level of 32 as the "starting point and initial benchmark" in arriving at the appropriate sentence for the defendant. *Gall*, 552 U.S. at 49.

Should the Court instead apply the PSR's alternative Guideline calculation for unlawful possession of a firearm under § 2K2.1(a)(5), it is the position of the United States that the alternative PSR correctly calculated the total offense level of 27, criminal history category of III, and Guideline range of 87-108 months.

### b. Sentencing Variance Inapplicable

After determining the applicable Guidelines range, a court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a). In considering those factors, particularly the history and characteristics of the defendant, the PSR recommends that the Court sentence the defendant to a substantial downward departure, from 151 to 188 months, to 24 months for Counts 1, 3, and 4. This recommendation

is unchanged in the revised PSR, and the downward departure from the alternative calculations, from 87-108 months to 24 months, remains substantial. *See* Rev. PSR at 6. The history and characteristics cited by the PSR, however, do not come close to justifying the magnitude of the recommended variance from the Guidelines range. Indeed, such a substantial variance would ignore the gravity of the defendant's actions and the impact of his crimes on the victim and the victim's family.

Section 3553 requires to the Court to consider the need for the sentence imposed to: 1) reflect the seriousness of the offense; 2) promote respect for the law; 3) provide just punishment for the offense; 4) afford adequate deterrence to criminal conduct; 5) protect the public from further crimes of the defendant; and, 6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2). Section 3553(a) also directs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been convicted of similar conduct. § 3553(a)(1) & (6). Section 3553(a) then requires the Court to impose a sentence sufficient to comply with these purposes.

The PSR recommends a downward variance from either a 151 to 188 month or 87 to 108 month range to 24 months. This is the equivalent of a 12- to 17-level downward departure for the defendant based on his youth, "purported physical and sexual abuse as a child, drug addiction, limited education, difficult childhood, physical and mental health issues, lack of occupational skills, limited criminal record, and lack of a prior prison record." None of these factors, however, place him outside the "'mine run of roughly similar' cases considered by the Sentencing Commission in formulating the Guidelines." *United States v. Carter*, 560 F.3d 1107, 1011-12 (9th Cir. 2009) (imposition of a within-Guidelines sentence reasonable despite defendant's youth, prior non-violent criminal history, and difficult childhood because nothing about those circumstances placed the defendant outside the heartland of similar characteristics and circumstances contemplated by the Guidelines); *United States v. Stoterau*, 524 F.3d 988, 1002 (9th

Cir. 2008) (imposition of within-Guidelines sentence reasonable because abuse defendant "suffered as a child, his mental health issues, and his life-long struggle with methamphetamine addiction" did not constitute special circumstances compelling a downward variance).

Additionally, several of the characteristics the PSR cites do not support a downward variance at all. While the PSR lists the defendant's age, limited criminal record, and lack of a prior prison record as factors that favor a variance, on closer examination, and when considered together, they actually undercut Probation's recommendation. The Guidelines calculation already takes account of the defendant's criminal history. And although the defendant, at 21 years old, was young at the time he committed the instant offenses, he did not have a clean record beforehand, and had spent time in a juvenile facility. Further, in the less than three-year period between when he committed the instant crimes and when he was detained, he committed a violent offense against his then-three-year old child. The defendant's lack of prison time is therefore more attributable to his youth than to any demonstrated ability to obey the law. Both his youth and lack of prison time should not therefore be factors that weigh in his favor. Similarly, the PSR lists the defendant's lack of occupational skills as additional support for the variance, yet the PSR itself undercuts that recommendation, as it notes that the defendant is "skilled in construction, welding, and oil field pipeline repair" and that he has worked as a welder and on home repair. PSR at 21.

A downward variance of the magnitude recommended here requires significantly more to support it than this defendant's history and characteristics as described in the PSR. As an *en banc* panel of the Ninth Circuit noted, "'a major departure should be supported by a more significant justification than a minor one' . . . . [T]he greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a)—such as, for example, unwarranted disparity—may figure more heavily in the balance." *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50); *see also United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) (en banc) ("The Supreme Court in *Gall* explicitly instructed [appellate courts] to consider . . . the 'extent of the deviation [from the

Guidelines range] and ensure that the justification is sufficiently compelling to support the degree of the variance.") (citing *Gall*, 552 U.S. at 47) (third alteration in original). These characteristics are far from sufficient to justify a downward variance from, at a minimum, seven years to two years. *See* U.S.S.G. § 5H Commentary (noting that "[g]enerally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside of the applicable guideline range but for . . . determining the sentence within the applicable guideline range" and listing lack of guidance as a youth, criminal history, drug abuse, mental and emotional conditions, and employment records all as factors that, unless present to an unusual degree, do not ordinarily justify downward departures.).

Ultimately, a two-year sentence for shooting a sawed-off shotgun at a complete stranger standing in his front yard with his family, because of his race and his choice to live in a particular neighborhood, and then lying about it to the FBI, neither reflects the seriousness of the defendant's crimes nor provides a just punishment for them. It also fails to account for the defendant's failure to accept responsibility for his actions, even after conviction. A significant downward variance would also not afford adequate deterrence of similar conduct by others, and would send the signal that terrorizing a family on the basis of their race is not deserving of serious sanction. Moreover, it fails to satisfy § 3553(a)'s additional directive to avoid large and unwarranted sentencing disparities. The purposes enumerated in § 3553(a) would thus not be served by a sentence that deviates so significantly from the Guidelines range. The PSR's recommendation should therefore be rejected. The United States recommends that this Court instead impose a sentence of 120 months for Counts 1, 3, and 4, which would represent a modest downward variance from the original Guideline range. Alternatively, should the Court rely on the unlawful possession of a firearm calculation, the United States recommends that the Court impose a within-Guideline sentence of 108 months. Such a sentence would be sufficient, but not greater than necessary to comply with the purposes set out in § 3553(a), and would also reflect the considerable break the defendant received by not being sentenced pursuant to the attempted murder guideline

### III. Conclusion

For the reasons set forth above, the United States respectfully requests that the defendant be sentenced to 120 months for Counts 1, 3, and 4, consecutive to a 10-year sentence for Count 2. Such a sentence will take account of the defendant's history and characteristics while reflecting the gravity of his crimes, affording adequate deterrence, and promoting respect for the law.

Dated: April 4, 2017                                              Respectfully submitted,

                                                   PHILLIP A. TALBERT
                                                   Acting United States Attorney

By      /s/ Brian K. Delaney
       BRIAN K. DELANEY
       Assistant U.S. Attorney

       /s/ Samantha Trepel
       SAMANTHA TREPEL
       Trial Attorney